25CA0850 Colorado Medical Board v Kim 08-13-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0850
Colorado Medical Board
Case Nos. 2023-4545 & 2023-8821

---

Colorado Medical Board,

Petitioner-Appellee,

v.

Geoffrey S. Kim, M.D., License No. DR.0043664,

Respondent-Appellant.

---

ORDER AFFIRMED

Division V
Opinion by JUDGE YUN
Lipinsky and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 13, 2026

---

Philip J. Weiser, Attorney General, C. Brent Kelly, Senior Assistant Attorney General, Jenna H. Anderson, Senior Assistant Attorney General, Ashley Barrett Carter, Senior Assistant Attorney General, Brian A. Keener, Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Eric Maxfield Law, LLC, Eric Maxfield, Louisville, Colorado, for Respondent-Appellant

¶ 1    Geoffrey S. Kim appeals the Colorado Medical Board's final order revoking his license to practice medicine for unprofessional conduct involving two patients.  Kim challenges the Board's findings that he violated the Medical Practice Act (MPA) by (1) being convicted of a felony based on the death of the first patient (patient 1); (2) providing substandard care to the second patient (patient 2); and (3) failing to document "essential" medical information for patient 2.  We affirm the Board's decision.

## I.    Background

¶ 2    Kim was a plastic surgeon who owned an office-based surgery center.  We first describe his conduct toward the two patients, then turn to the administrative proceedings.

## A.    Patient 1

¶ 3    On August 1, 2019, Kim was scheduled to perform breast augmentation surgery on patient 1.  After a certified registered nurse anesthetist administered anesthesia, patient 1 went into asystole and began to turn blue.  (Asystole is a life threatening condition characterized by the absence of electrical and mechanical activity in the heart, appearing as a flat line on an electrocardiogram.  Mosby's Medical Dictionary 159 (7th ed. 2006);

Cleveland Clinic, *Asystole*, https://perma.cc/6Z6S-NNLH.)  Kim

entered the operating room, began cardiopulmonary resuscitation

(CPR), and resuscitated patient 1.  Despite patient 1's asystolic

arrest, Kim did not contact emergency medical services (EMS) for

approximately five hours.  Patient 1 did not regain consciousness.

¶ 4  After patient 1's mother filed a complaint against Kim, the

Board suspended Kim's license to practice medicine in January

2020.  One month later, Kim and the Board entered into a

stipulation to settle "all matters set forth in" the Board's case

arising from Kim's treatment of patient 1.  In the stipulation, Kim

admitted to violating the MPA by engaging in "unprofessional

conduct" — specifically, by committing an "act or omission which

fail[ed] to meet generally accepted standards of medical practice."

*See* § 12-240-121(1)(j), C.R.S. 2025.

¶ 5  Patient 1 died on October 4, 2020, fourteen months after the

procedure.  Criminal charges were filed against Kim in early 2022.

At his trial, the prosecution presented evidence that Kim delayed

seeking emergency care for patient 1.[1]  *See People v. Kim*, (Colo.

---

[1] We may take judicial notice of the contents of court records in a related case.  *People v. Sa'ra,* 117 P.3d 51, 56 (Colo. App. 2004).

2

App. No. 23CA2000, Apr. 17, 2025) (not published pursuant to C.A.R. 35(e)) (*cert. denied* Jan. 26, 2026).  The evidence introduced at trial showed that, while patient 1 remained unconscious for over five hours, Kim repeatedly assured her mother that she was "fine."  *Id.* at ¶ 4.

¶ 6      The anesthetist testified that he and other staff members repeatedly asked Kim to call 911, but Kim either ignored or dismissed their requests.  *Id.* at ¶ 82.  On cross-examination, defense counsel questioned whether the anesthetist had "reached an agreement with the DA's office to dismiss [his] charges in exchange for testifying" against Kim.  The anesthetist responded that, "as [he] underst[ood] it," the charges filed against him regarding patient 1 "were dismissed once they had questioned [him] and received [his] testimony and felt that there [were no] grounds for the charges."  The jury found Kim guilty of attempted reckless manslaughter.[2]

---

[2] The court sentenced Kim to fifteen days in jail, two years of probation, community service, fines and costs totaling over seventy thousand dollars, and additional probation conditions.

¶ 7    The day after Kim's sentencing, the Attorney General's Office filed a formal complaint against Kim alleging two violations of the MPA arising from the events of August 1, 2019.  The complaint asserted that Kim engaged in "unprofessional conduct" with respect to patient 1 as follows:

(1)    he was convicted of a felony — attempted reckless manslaughter — in violation of section 12-240-121(1)(b); and

(2)    he provided substandard care in violation of section 12-240-121(1)(j) by withholding critical medical information from patient 1's mother and the medical providers who later assumed her care, and by making false statements to those providers.

## B.    Patient 2

¶ 8    On October 14, 2020, only ten days after patient 1's death, Kim was performing breast augmentation surgery on patient 2 when she experienced an asystolic arrest.  The anesthesiologist assisting in the procedure called out "code blue" and said "call for help."  (A code blue is the term used during a medical emergency when a patient has a cardiac or respiratory arrest.  Cleveland

4

Clinic, *Hospital Code Blue*, https://perma.cc/9RWR-AY62.)  Kim again failed to contact EMS and instructed his staff not to call for those services.  After patient 2 was resuscitated and awoke from the anesthesia, Kim allowed her fiance to drive her to a hospital.[3]  Unlike patient 1, patient 2 eventually made a full recovery.

¶ 9       In June 2024, the Attorney General filed a second formal complaint against Kim alleging two violations of the MPA arising from the events of October 14, 2020.  The complaint stated that Kim committed two counts of "unprofessional conduct" regarding patient 2:

(1)    he provided substandard care in violation of section 12-240-121(1)(j) by, among other things, "[f]ailing to call 911 or otherwise summon[ing] EMS during or immediately after [the] patient's cardiac arrest" and by arranging for her to be transported to a hospital by private vehicle; and

---

[3] It is unclear from the record whether the person who accompanied patient 2 to the surgery center was her fiance or husband.  We refer to him as her fiance for consistency.

(2)   he failed to document "essential entries" — such as the true duration of patient 2's asystole, "a sufficient account of [her] cardiac arrest and resuscitation," or his communications regarding her transport to emergency care by private vehicle — in violation of section 12-240-121(1)(j).

### C.   Administrative Proceedings

¶ 10    An administrative law judge (ALJ) consolidated the disciplinary cases involving patient 1 and patient 2.  Kim moved to dismiss both counts in the patient 1 case, arguing that the stipulation barred them.  The ALJ agreed in part.  He dismissed the second count — concerning substandard care — but allowed the first count — concerning the felony conviction — to proceed.

¶ 11    Kim next moved for summary judgment on the first count in the patient 1 case, contending that his underlying conviction was unconstitutional under *Napue v. Illinois*, 360 U.S. 264 (1959), because the anesthetist had committed perjury by denying any agreement with the prosecution to testify against Kim in exchange for the dismissal of his own charges.  To support this, Kim submitted the cross-examination transcript and an

6

unauthenticated proffer letter from the prosecutor, which stated that pending charges would be dismissed if the anesthetist provided "full, complete, and truthful" testimony at Kim's trial.  The ALJ denied Kim's motion, reasoning that it was not appropriate to "second-guess the criminal process" and, in any event, that Kim had provided insufficient evidence of perjury.

¶ 12     Shortly thereafter, the Board moved for summary judgment on the same count for patient 1, citing Kim's felony conviction.  The ALJ granted summary judgment, finding that Kim's conviction for patient 1's death constituted unprofessional conduct under the MPA.

¶ 13     The ALJ then held an evidentiary hearing on the two counts involving patient 2.  As relevant to this appeal, the hearing included testimony from Kim, the anesthesiologist who attended the procedure, and both parties' expert witnesses, as well as deposition testimony from the nurse who assisted with the surgery.  The ALJ accepted the Board's expert as qualified in Kim's field of plastic surgery.  The following evidence was presented regarding patient 2:

- At 11:34 a.m., patient 2 experienced an asystolic arrest while under the care of Kim, the anesthesiologist, and the

nurse.  The anesthesiologist called out "code blue" and "call for help."  Upon hearing the anesthesiologist's directive, the nurse repeatedly asked Kim if she should call 911, but each time, Kim told her "no" or ignored her.  Kim denied instructing the nurse not to call 911.[4]

- According to the anesthesiologist's detailed notes, patient 2's asystolic arrest lasted four minutes.  In contrast, Kim's sparse notes stated that the asystolic arrest lasted twenty to thirty seconds and omitted any mention of a shockable rhythm.  (A shockable rhythm is an abnormal, life-threatening heart rhythm during cardiac arrest that can be treated effectively with an electrical shock from a defibrillator.  ACLS.com, *Shockable Rhythms: Ventricular Tachycardia, Ventricular Fibrillation, Supraventricular Tachycardia*, https://perma.cc/B5WZ-KWRD.)

---

[4] The nurse provided testimony through a phone interview with the Board's attorney on July 24, 2024, and a deposition on July 17, 2024.  At the evidentiary hearing on August 20, 2024, Kim denied telling the nurse not to call 911.  The nurse died from natural causes that same day — the day before she was scheduled to testify.

- The Board's expert testified that crucial details of a patient's cardiac arrest, such as the presence of a shockable rhythm and the duration of the asystole, should be included in the medical records.

- When patient 2 awoke from anesthesia, Kim realized that 911 had never been called, yet he still did not call 911 or direct others to do so.

- Both the Board's and Kim's experts agreed that a reasonably prudent physician would call 911 if a patient experienced asystole. Kim's expert stated that advanced cardiovascular life support (ACLS) protocols did not mandate calling 911, while the Board's expert testified that they did.

- Kim agreed for patient 2 to be transported to a hospital in her fiance's car, claiming that she was so concerned about costs that she would have gone home if he had insisted on ambulance transport. Kim did not document any discussion with patient 2 or her fiance about transportation.

- The Board's expert testified that, if patient 2 threatened to go home rather than take an ambulance, Kim should have documented both the conversation and his recommendation.

- Upon arrival at the emergency department, patient 2 raised concerns about the cost of hospitalization. Emergency department staff addressed her concerns, persuaded her to consent to admission, and documented the discussion in the discharge summary.

¶ 14 Following the hearing, the ALJ issued an initial decision revoking Kim's medical license after finding three violations of the MPA:

(1) Kim's felony conviction for patient 1 constituted unprofessional conduct under section 12–240–121(1)(b);

(2) Kim's substandard care for patient 2 constituted unprofessional conduct under section 12–240–121(1)(j) because he "did not see to [it] that 911 was called when the patient's heart stopped" or "that patient 2 was transported by ambulance to the hospital upon . . . awak[en]ing from anesthesia"; and

10

(3) Kim's failure to document essential information for patient 2 constituted unprofessional conduct under section 12–240–121(1)(j) because he failed to document the presence of a shockable rhythm, any discussion with patient 2 regarding ambulance transport, and the accurate duration of asystole, thereby minimizing the severity of what occurred.

¶ 15 Kim filed exceptions to the ALJ's initial decision with the Board, arguing that none of the three counts had been proved and advancing the same arguments he now asserts on appeal. The Board unanimously affirmed the ALJ's findings and issued a final order revoking Kim's Colorado medical license.

¶ 16 This appeal followed.

## II. Standard of Review and Relevant Law

¶ 17 Our review of the Board's decision is governed by section 24-4-106(7), C.R.S. 2025. The statute provides that a court "shall hold unlawful and set aside" any administrative agency action if it determines that the agency action is:

(I) Arbitrary or capricious;

(II) A denial of statutory right;

(III)  Contrary to constitutional right, power, privilege, or immunity;

(IV)  In excess of statutory jurisdiction, authority, purposes, or limitations;

(V)   Not in accord with the procedures or procedural limitations of this article 4 or as otherwise required by law;

(VI)  An abuse or clearly unwarranted exercise of discretion;

(VII) Based upon findings of fact that are clearly erroneous on the whole record;

(VIII) Unsupported by substantial evidence when the record is considered as a whole; or

(IX)  Otherwise contrary to law, including failing to comply with section 24-4-104(3)(a) or 24-4-105(4)(b)[, C.R.S. 2025].

§ 24-4-106(7)(b)(I)-(IX).

¶ 18    "In applying this standard, we presume the validity and regularity of the administrative proceedings and resolve all reasonable doubts as to the correctness of the administrative ruling in favor of the agency." *Romero v. Colo. Dep't of Hum. Servs.*, 2018 COA 2, ¶ 25; *Dep't of Hum. Servs. v. State Pers. Bd.*, 2016 COA 37, ¶ 14. "We must review the record in a light most favorable to the administrative decision and should give deference to the weight and

12

credibility determinations of the Board." *Colo. State Bd. of Med. Exam'rs v. Thompson*, 944 P.2d 547, 551 (Colo. App. 1996).

¶ 19 Section 12-240-125, C.R.S. 2025, provides the process by which the Board may impose discipline for a physician's unprofessional conduct, including, as relevant here, revocation of the physician's medical license. Unprofessional conduct includes (1) "[a]ny conviction of an offense of moral turpitude, a felony, or a crime that would constitute a violation of this article 240" under section 12-240-121(1)(b); (2) substandard care under section 12-240-121(1)(j), defined as "[a]ny act or omission that fails to meet generally accepted standards of medical practice"; and (3)"repeatedly making incorrect essential entries or repeatedly failing to make essential entries on patient records" under section 12-240-121(1)(v).

¶ 20 When a disciplinary statute refers to "generally accepted standards," the Board's conclusions about the standard of care are treated as findings of ultimate fact. *State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188, 1195 (Colo. 1994). A finding of ultimate fact is a "conclusion[] of law or mixed question[] of law and fact that [is] based on evidentiary facts and determine[s] the rights and

13

liabilities of the parties." *Samaritan Inst. v. Prince-Walker*, 883 P.2d 3, 9 (Colo. 1994) (quoting *Federico v. Brannan Sand & Gravel Co.*, 788 P.2d 1268, 1272 (Colo. 1990)). We will uphold the Board's determination of the applicable standard of practice if it has a reasonable basis in law and is supported by substantial evidence. *Colo. State Bd. of Med. Exam'rs v. Ogin*, 56 P.3d 1233, 1238 (Colo. App. 2002); *see Lee v. State Bd. of Dental Exam'rs*, 654 P.2d 839, 844 (Colo. 1982). Generally, the accepted standards of medical practice must be established through expert testimony. *See McCroskey*, 880 P.2d at 1194 (citing *United Blood Servs. v. Quintana*, 827 P.2d 509, 520 (Colo. 1992)); *see also Ogin*, 56 P.3d at 1238 ("The nature and existence of a standard of practice must be established by expert testimony."). While written protocols may reflect standards of care, they are not, by themselves, dispositive of the standard of care in a particular case. *Quintana*, 827 P.2d at 525.

III. Kim's Violation Under Section 12-240-121(1)(b)

¶ 21 Kim contends the Board cannot discipline him for his felony conviction related to patient 1's death for three reasons: (1) his conviction was unconstitutional; (2) his conviction was not final

14

until his appeal was exhausted; and (3) even if the conviction stands, the Board cannot impose discipline for conduct previously addressed by a stipulation. We disagree with each contention.

¶ 22 First, we reject Kim's contention that the Board cannot revoke his license simply because, in his view, the anesthetist's testimony rendered his conviction unconstitutional under *Napue*. In that case, the United States Supreme Court held that a defendant's conviction may be overturned upon proof that a witness gave materially false testimony that the prosecutor knowingly solicited or failed to correct. *See Napue*, 360 U.S. at 269; *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) (clarifying that the witness's false testimony must be material to establish a constitutional violation).

¶ 23 The record does not support Kim's assertion that the anesthetist gave false testimony. Kim points to the prosecutor's proffer letter as proof that the anesthetist falsely denied his "dismissal-for-testimony" deal. But the letter requires "truthful" testimony and does not contradict the anesthetist's testimony that he *thought* the charges were dropped because the prosecutor "felt

that there wasn't grounds for the charges" after hearing his full account.

¶ 24    More importantly, even if the record suggested a plausible *Napue* violation, Kim could raise his challenge only in his criminal trial, direct appeal, or postconviction proceedings — not in an administrative proceeding.  In his criminal appeal, Kim argued that the prosecution committed misconduct by allowing "the anesthetist to commit perjury by testifying that 'as he understood it,' his charges were dismissed because the prosecution felt 'there [were not] grounds for charges' rather than in exchange for his testimony."  *Kim*, No. 23CA2000, slip op. at ¶ 60.  A division of this court rejected this challenge, concluding that Kim presented insufficient evidence "to establish that the prosecution knowingly allowed the anesthetist to perjure himself."  *Id.* at ¶ 61.  Now, in this administrative appeal, Kim reframes his challenge to the anesthetist's testimony as a *Napue* violation by relying on the proffer letter and citing section 24-4-106(7) to argue that we have an "independent duty — separate from the criminal appeal — to assess whether the verdict was so compromised as to preclude reliance upon it."  This argument is improper.  Section 24-4-106(7)

authorizes us to determine whether "the *agency* action" is "contrary to law" or a "constitutional right." (Emphasis added.) Kim cannot use section 24-4-106(7) to raise a new challenge to his conviction in his criminal trial. Neither the ALJ reviewing Kim's summary judgment motion, nor the Board reviewing the ALJ's decision, nor this court reviewing the Board's order has the authority to declare his criminal conviction unconstitutional.

¶ 25    Second, we likewise reject Kim's argument that the Board could not impose discipline for his conviction until his criminal appeal was exhausted. "Unprofessional conduct" includes "[a]ny conviction of . . . a felony." § 12–240–121(1)(b). And "[f]or purposes of this subsection (1)(b), 'conviction' includes the entry of a plea of guilty or nolo contendere or the imposition of a deferred sentence." *Id.* "[E]ven if a licensee has a meritorious claim that an underlying conviction is not valid, the [agency] hearing officer *cannot* ignore the conviction until it has been ruled invalid and set aside by a court." *State v. Laughlin*, 634 P.2d 49, 51 (Colo. 1981) (emphasis added).

¶ 26    Kim argued that the Board was required to wait for the outcome of his criminal appeal before revoking his license. But the Board — tasked with protecting public health and safety — cannot

17

disregard a conviction until it is reversed, overturned, or set aside. *See* § 12-240-102, C.R.S. 2025; *Laughlin*, 634 P.2d at 51. Given the broad definition of "conviction" and the MPA's purpose, we agree with the Board that requiring finality — a time-consuming appellate process — would frustrate the MPA's goal of safeguarding public safety and health. Thus, even though Kim had a pending appeal at the time of the administrative proceedings, the Board did not act improperly by imposing discipline based on his existing felony conviction.

¶ 27 Moreover, and crucially, Kim's conviction *is* now final. In April 2025, a division of this court rejected his multiple constitutional challenges and upheld his conviction, and in January 2026, the supreme court denied Kim's petition for certiorari. *See Kim*, No. 23CA2000, slip op. at ¶ 84; *Kim v. People*, (Colo. No. 25SC316, Jan. 26, 2026) (unpublished order). Although Kim may still pursue collateral challenges to his conviction, his conviction is final for purposes of this appeal. *See Lewis v. United States*, 445 U.S. 55, 60-61 (1980) (holding that a felony conviction subject to collateral attack may still serve as a predicate for subsequent offenses because the existence of the prior conviction is the critical fact).

¶ 28    Third, we disagree with Kim's contention that the Board is barred from disciplining him for "the [s]ame conduct addressed in the Stip[ulation]." Kim argues that contract principles and equitable estoppel prevent further discipline for his care of patient 1. When he previously raised this argument, the ALJ correctly dismissed count two — alleging substandard care under section 12-240-121(1)(j) — because the stipulation included the Panel's finding of substandard care in violation of that section. *See USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997) ("The intent of the parties to a contract is to be determined primarily from [its] language . . . ."). But nothing in the stipulation indicated that the parties intended to resolve any future claim based on a conviction under section 12-240-121(1)(b), even if that conviction arose from the events generally described in the stipulation. Patient 1 died eight months after the parties entered into the stipulation, and the jury found Kim guilty of attempted manslaughter more than three years later. *See* § 18-1-402, C.R.S. 2025. Thus, Kim's conviction was not — and could not have been — a matter included in the stipulation because it had not yet occurred.

¶ 29    For similar reasons, Kim cannot establish the elements of equitable estoppel. Equitable estoppel applies only if four elements are met:

> (1) the party to be estopped by its conduct must know the facts; (2) that party must intend that the conduct be acted upon or must act so the party asserting estoppel is justified in believing the conduct was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) that party must detrimentally rely on the other party's conduct.

*Bontrager v. La Plata Elec. Ass'n*, 68 P.3d 555, 561 (Colo. App. 2003). But Kim cannot satisfy the first element. Kim asserts that "knowledge is imputed to the Board" because it was aware that patient 1's family had filed a police report and the Board was required to conduct a "full investigation" before imposing discipline. *See* § 24-4-104(4)(a). But the Board cannot act based on what might occur three years later. *See Graeb v. State Bd. of Med. Exam'rs*, 139 P. 1099, 1101 (Colo. 1913) ("[E]ven the commission of a crime is not [a] sufficient basis for revocation [of a medical license;] . . . there must first be [a] conviction.").

¶ 30    For these reasons, we conclude that the Board properly adopted the ALJ's decision to revoke Kim's license based on his

20

violation of section 12-240-121(1)(b) resulting from his felony conviction.

## IV. Kim's Violation Under Section 12-240-121(1)(j)

¶ 31 Kim contends that the Board cannot discipline him for providing substandard care to patient 2 — specifically, for failing to ensure that 911 was called in connection with her cardiac arrest and for permitting her to be transported to the hospital emergency room by private car rather than by ambulance. Kim raises four main arguments: (1) he "successfully" defeated the original charge regarding the 911 call; (2) the ALJ violated his due process rights by introducing a "surprise" charge about the 911 call — namely, that he had a unique duty to "see to it" that EMS was actually summoned; (3) the Board's discipline related to the 911 call violated his right to equal protection; and (4) the Board's finding about ambulance transport effectively required him to violate patient 2's statutory rights under Colorado's Patient Autonomy Act (CPAA). *See* §§ 15-14-503 to -509, C.R.S. 2025 (codification of the CPAA); §§ 15-18.5-101 to -105, C.R.S. 2025 (addressing proxy decision-makers for medical treatment). We disagree with each contention.

¶ 32    First, Kim did not successfully defend against the "original" charge regarding the 911 issue.  The complaint originally alleged that Kim committed "one or more" of the following acts of substandard care regarding 911:

(1)    "Failing to call 911 or otherwise summon EMS during or immediately after a patient's cardiac arrest";

(2)    "Failing to follow [basic life support]/ACLS protocols to contact EMS as soon after chest compressions were started as practicable"; and

(3)    "Telling one or more licensed medical professionals or other staff not to call 911 during, or immediately after, a patient asystole event involving CPR and defibrillation."

¶ 33    The Board's conclusion — that "generally accepted standards of practice required [Kim] to summon emergency services for his patient who experienced asystole" — is supported by substantial evidence.  Both parties' experts testified that a reasonably prudent physician would have called 911 in this situation.  Kim's argument that the anesthesiologist's directive to "call for help" satisfied his obligations is misplaced because, as the Board noted, the key issue is whether emergency services were "actually summoned."  Kim had

22

actual knowledge that no one called EMS. A nurse testified that she asked Kim whether she should call 911 several times, both during and after patient 2's asystolic arrest, but Kim either told her "no" or ignored her.

¶ 34     Kim's reliance on his own expert's testimony about the ACLS protocols is likewise unconvincing. The Board's expert — the only one accepted as an expert in Kim's field of plastic surgery — testified that the ACLS protocols required calling 911. Kim insists that we must defer to his expert's contrary opinion, claiming that the Board's expert was "manifestly unqualified" on the protocols. But credibility determinations rest with the ALJ and not appellate courts. *Thompson,* 944 P.2d at 551. And regardless of either expert's interpretation of the protocols, the protocols, by themselves, do not determine the standard of care. *Quintana,* 827 P.2d at 525. Expert testimony does. *See McCroskey,* 880 P.2d at 1194 (holding that "'generally accepted standards of medical practice' . . . usually must be established by expert testimony"). Thus, the Board's conclusion was supported by substantial evidence because, despite differing views on the protocols, both

experts agreed that a reasonably prudent physician would call 911 when faced with asystole.

¶ 35   Second, Kim's due process rights were not violated.  He contends that the Board violated these rights by adopting the ALJ's "surprise finding that Kim 'did not see to [it] that 911 was called'" after he claims to have "successfully defended against the original charge by proving the directive to call 911."

¶ 36   Due process in an administrative proceeding requires "adequate notice of the nature of the proceedings."  *Colo. State Bd. of Dental Exam'rs v. Micheli*, 928 P.2d 839, 842 (Colo. App. 1996). Kim received adequate notice because the complaint clearly identified the conduct at issue — "[f]ailing to call 911 or otherwise summon EMS" — and the relevant provision of the MPA — section 12-240-121(1)(j).  *See Colo. State Bd. of Med. Exam'rs v. Hoffner*, 832 P.2d 1062, 1066 (Colo. App. 1992) (complaint complied with due process by specifying the prohibited conduct); *Colo. State Bd. of Med. Exam'rs v. Boyle*, 924 P.2d 1113, 1117 (Colo. App. 1996) (notice was sufficient when the hearing notice and attached complaint contained citations to the applicable provisions of the MPA).  Mirroring the language of the complaint, the Board's final

24

order found that "generally accepted standards of practice required [Kim] to summon emergency services for his patient who experienced asystole" and, therefore, that Kim violated section 12-240-121(1)(j).

¶ 37 Nevertheless, Kim points to varying timelines referenced with respect to this duty — the complaint described the duty as calling 911 "during or immediately after a patient's cardiac arrest" or "as soon after chest compressions were started as practicable," while the ALJ framed the duty as "when the patient's heart stopped." Kim insists that he fulfilled his duty "during the code" and lacked notice of any "continuing duty, lingering over the next hour-plus." But the core allegation throughout the proceeding remained the same: Kim failed to summon emergency services for a patient who experienced cardiac arrest while under his care. It is unclear why Kim believes his duty was satisfied earlier; no one ever called 911 — not after patient 2's heart stopped, not during the code, not after her cardiac arrest, and not when she awoke from anesthesia. Accordingly, we conclude that the Board's order did not violate Kim's constitutional right to due process.

¶ 38    Third, we reject Kim's argument that imposing on him a unique duty to "see to it" that EMS is summoned violates equal protection principles.  Kim contends that the Board denied him equal protection — particularly regarding the 911 call — because the anesthesiologist and the registered nurse did not lose their respective licenses.  However, Kim cannot demonstrate that either practitioner was similarly situated to him — a threshold requirement for an equal protection claim.  *People v. Young*, 859 P.2d 814, 816 (Colo. 1993).

¶ 39    The nurse's conduct was regulated by the Board of Nursing, while Kim's conduct was regulated by the Medical Board.  Each profession is subject to a different statute and regulatory schemes, *compare* § 12-240-101 to -147, C.R.S. 2025 (medical practice), *with* § 12-255-101 to -215, C.R.S. 2025 (nurses and nurse aids), with distinct scopes of practice and oversight.  Moreover, the nurse further testified that Kim repeatedly instructed her not to call 911.  Accordingly, Kim's argument that a nurse is similarly situated to a surgeon is unpersuasive.  *See Ochoa v. Vered*, 212 P.3d 963, 966 (Colo. App. 2009) (a surgeon, as captain of the ship, has the right to direct or control the actions of nurses in the operating room).

26

¶ 40    In addition, although the same Board regulated both the anesthesiologist and Kim, they were situated differently in key respects regarding their care of patient 2.  The anesthesiologist was assigned to assist in the procedure, while Kim was the surgeon operating on *his* patient in his own surgery center.  The record does not indicate that the anesthesiologist had any disciplinary or criminal history.  In contrast, Kim had his license suspended for his care of patient 1 and was convicted of attempted manslaughter.  Consequently, Kim's equal protection claim fails because he did not establish that either practitioner was similarly situated to him.

¶ 41    Fourth, we reject Kim's argument that the Board's finding regarding ambulance transport forced him to violate patient 2's statutory rights to autonomy.  Kim appears to concede that ambulance transport is preferable for a patient who has just been in cardiac arrest, but he argues that the CPAA, found in title 15 "Probate, Trusts, and Fiduciaries," justified his actions.  *See* §§ 15-14-503 to -509; §§ 15-18.5-101 to -105.  Kim quotes two excerpts from the CPAA: "Colorado law recognizes the right of an adult to accept or reject medical treatment" and "affirm[s] a

patient's autonomy in accepting or rejecting medical treatment."
§ 15-14-504(1)(a), (c), C.R.S. 2025.

¶ 42    But the CPAA does not shield Kim from discipline for substandard care.  Kim argues that he faced a choice between arranging ambulance transport and honoring patient 2's wishes under the CPAA, which he failed to document.  However, the CPAA concerns a patient's right to accept or refuse "medical treatment" primarily through prospective, documented directives — such as a medical durable power of attorney.  It does not excuse after-the-fact, undocumented assertions by a provider regarding a patient's preferences and is thus irrelevant to the Board's substandard care findings.

¶ 43    Even if the CPAA applied and its reference to "medical treatment" encompassed ambulance transport, expert testimony supports the Board's finding that patient autonomy did not override Kim's duty to arrange ambulance transportation to a hospital.  As the ALJ noted, "a physician has ways to convince a patient to do the right thing for their safety."  This was demonstrated when the emergency department staff persuaded patient 2, despite her concerns about hospital costs, that hospitalization was necessary.

28

Thus, patient autonomy did not excuse Kim's obligation to provide patient 2 with ambulance transportation to a hospital.

## V. Kim's Violation Under Section 12-240-121(1)(v)

¶ 44 Kim contends the Board cannot discipline him for failing to document three essential entries related to patient 2's care because the record lacks "substantial evidence" to support a finding of "[s]ubstandard [r]ecordkeeping." The Board, however, did not err by adopting the ALJ's conclusion that Kim violated section 12-240-121(1)(v).

¶ 45 Contrary to Kim's assertions, the record contains substantial evidence supporting the Board's order:

¶ 46 *Presence of patient 2's shockable rhythm.* Kim disputes that this was an essential entry, but the Board's expert testified that the medical record should have included details of patient 2's major cardiac event — such as whether she had a shockable rhythm before defibrillation. Hospital records show that subsequent providers could not assume patient 2 had a shockable rhythm. One provider noted, "[I]t does not sound like she had a shockable rhythm," and another recorded, "[S]urgery team . . . shocked

[patient 2] though she has not reported to be in v.tach, v.fib or SVT."[5]

¶ 47    *Length of asystolic arrest.*  Kim disputes the ALJ's finding that the asystole lasted four minutes and challenges the conclusion that he minimized its duration.  Kim's notes described "[a]systole approximately in 20-30s," while the anesthesiologist's detailed notes reported a four-minute asystole.  Kim claims that the notes are complementary: His thirty-second notation depicted the period of asystole, a subpart of the four-minute resuscitation period depicted by the anesthesiologist.  But the Board's expert testified that the anesthesiologist's note plainly described a four-minute asystole, not a four-minute resuscitation, and the anesthesiologist testified that,

---

[5] Ventricular tachycardia (V-tach) is a potentially life-threatening heart rhythm where the heart's lower chambers (ventricles) beat so rapidly that they cannot pump blood effectively.  Mayo Clinic, *Ventricular Tachycardia,* https://perma.cc/2XBN-NK3K.  Ventricular fibrillation (V-fib) is a potentially life-threatening heart rhythm where the ventricles contract in a very rapid and uncoordinated manner, preventing any effective blood flow.  Mayo Clinic, *Ventricular Fibrillation,* https://perma.cc/UVY6-KFUP.  Supraventricular tachycardia (SVT) is a heart rhythm disorder where abnormal electrical signals in the upper heart chambers cause the heart to suddenly accelerate, often reaching rates of 150 to over 200 beats per minute.  Mayo Clinic, *Supraventricular Tachycardia,* https://perma.cc/8GCG-LTXD.

consistent with her notes, the asystole occurred at 11:34 a.m. and a shockable rhythm was not confirmed until 11:38 a.m. The ALJ credited their testimony.

¶ 48 *Conversation about private transport.* Kim disputes the finding that his testimony regarding patient 2's threat to go home if he insisted on ambulance transport was not credible. He argues that this alleged conversation did not need to be documented because it was not an essential entry. The ALJ did not credit Kim's testimony, and Kim's contemporaneous notes state only that patient 2 was "sent" to the emergency room. The Board's expert testified that patient 2's purported transportation preference was a significant detail in patient 2's care and should have been documented as an essential entry. He similarly testified that Kim should have documented in patient 2's medical chart his own recommendation for ambulance transport, together with any refusal by patient 2.

¶ 49 Accordingly, substantial evidence supports the Board's adoption of the ALJ's finding that Kim failed to document patient 2's shockable rhythm, the length of her asystolic arrest, and her alleged refusal of ambulance transport. Given the expert testimony deeming these entries essential, the Board properly adopted the

ALJ's conclusion that failing to document these entries violated the MPA.

¶ 50    In essence, Kim urges us to reweigh the evidence in his favor, disregard the Board's expert's testimony, credit his own testimony, and view the evidence in the light most favorable to him.  That is not our role.  The Board's determination is supported by substantial evidence in the record.  *See Baldwin v. Huber*, 223 P.3d 150, 152 (Colo. App. 2009).

## VI.    The Board's Exercise of Discretion

¶ 51    Finally, Kim contends that the Board abused its discretion by revoking his license because such discipline was manifestly excessive given the needs of the public.  He notes that he completed probation and received positive feedback from the practitioner assigned to audit him following the stipulation.  We are not persuaded.

¶ 52    The Board is afforded "great discretion in determining the appropriate sanction for unprofessional conduct, and its determination must be upheld on review unless it bears no relation to the conduct, is a gross abuse of discretion, or is manifestly excessive in relation to the needs of the public."  *Ogin*, 56 P.3d at

1240.  As a reviewing court, we may "not substitute [our] judgment for that of the board as to what constitutes appropriate sanctions." *Id.* Given Kim's multiple violations of the MPA, his felony conviction, and the death of patient 1, we conclude that the Board's discipline was not manifestly excessive.

## VII.  Disposition

¶ 53    The Board's order is affirmed.

JUDGE LIPINSKY and JUDGE SCHUTZ concur.